Timothy Coffield, Attorney (VSB No. 83430)
5374 Gordonsville Road
Keswick, VA 22947
Telephone: 434-218-3133
Email: tc@coffieldlaw.com

Counsel for Plaintiffs and Proposed Class

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| ABIGAIL HANGER, J.R. COLLINS, CHRIS HOWARD, JEANETTE ALEXANDER COLLINS, JULIA FULWIDER, and STEVEN FERRELL, individually and on behalf of all others similarly situated, | |
| **Plaintiffs,** | Case No. |
| v. | |
| THE BERKLEY GROUP, INC., Serve: Rebecca Foster<br>    Registered Agent<br>    2626 E. Oakland Park Blvd.<br>    Ft. Lauderdale, FL 33306 | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| GREAT EASTERN RESORT CORPORATION, INC., Serve: Clark & Bradshaw PC<br>    Registered Agent<br>    92 N Liberty St.<br>    Harrisonburg, VA 22802 | **CLASS ACTION** |
| WILLIAMSBURG PLANTATION, INC., Serve: ECR Services LLC<br>    Registered Agent<br>    16 S Second St,<br>    Richmond, VA 23219 | |
| **Defendants.** | |

**TABLE OF CONTENTS**

I.   SUMMARY OF ACTION ............................................................... 1

II.  JURISDICTION AND VENUE ................................................... 3

III. INTRADISTRICT ASSIGNMENT ............................................ 3

IV. CHOICE OF LAW.................................................................... 4

V.   PARTIES.................................................................................... 5

    A.  PLAINTIFFS ....................................................................... 5

    B.  DEFENDANTS ................................................................... 6

VI. CLASS ACTION ALLEGATIONS ........................................... 7

VII.  FACTS.................................................................................... 11

    A.  TRADE AND COMMERCE.............................................. 11

    B.  MARKET FOR TIMESHARE SALES PERSONNEL ..................... 11

    C.  THE UNLAWFUL AGREEMENT ................................................ 18

    D.  IMPACTS OF THE CONSPIRACY ON PLAINTIFFS AND THE CLASS ... 22

COUNT ONE ................................................................................... 26

COUNT TWO ................................................................................... 29

PRAYER FOR RELIEF ................................................................... 32

DEMAND FOR JURY TRIAL ....................................................... 33

Plaintiffs Abigail Hanger, J.R. Collins, Chris Howard, Jeanette Alexander Collins, Julia Fulwider, and Steven Ferrell, individually and on behalf of a class of all those similarly situated (the "Class"), bring this antitrust action to obtain damages and equitable relief against defendants The Berkley Group, Inc., Great Eastern Resort Corporation, Inc., ("GERC") and Williamsburg Plantation, Inc. ("WPI") (collectively, "Defendants" or "Berkley"), alleging as follows:

## I.     SUMMARY OF ACTION

1.     This action challenges a "global" no-solicitation and no-hiring agreement between Berkley and its direct competitor, Bluegreen Corporation. Without the knowledge or consent of their employees, Berkley and Bluegreen agreed to eliminate competition between them for skilled workers by refraining from hiring each other's current or former employees.[1] The agreement harmed Plaintiffs and other employees by lowering the salaries and benefits they might otherwise have commanded, and deprived these employees of better job opportunities at the other company. Rebecca Foster, President of Berkley, John Maloney, President of Bluegreen, and senior executives for both sides were intimately involved in forming, monitoring, and enforcing this anticompetitive agreement.

2.     The agreement had two purposes: to suppress the compensation of valuable timeshare sales personnel, and to insulate each firm's compensation practices from "scrutiny" under the Fair Labor Standards Act. This agreement was not limited by

[1] Global Settlement Agreement, October 16, 2007, by and between The Berkley Group, GERC, WPI, and their affiliates (the "Berkley Parties" or "Berkley") on one side, and Bluegreen Corporation, Leisure Capital Corporation, Great Vacation Destinations, Inc., and their affiliates (the "Bluegreen Parties" or "Bluegreen") on the other.

1   geography or time period, and was not ancillary to any legitimate collaboration between

2   Berkley and Bluegreen.

3          3.      The agreement, which was entered into on October 16, 2007, prohibited

4   either company, or any affiliate of either company, from hiring any current or former

5   employee of the other who was subject to a confidentiality, non-solicitation, or non-

6   compete covenant.  By design, this restraint had no set temporal or geographic limits. The

7   scope of each firm's no-hiring obligation was dictated by the broadest post-employment

8   restraint in the other firm's standard at-will employment agreement. The agreement thus

9   allowed either firm to expand the no-hiring restraint by simply revising its standard

10  employment agreement. From 2008 through 2013, the agreement effectively prevented

11  Bluegreen from hiring any former Berkley sales personnel at all without Berkley's written

12  approval. The agreement was enforced at the highest levels of each company.

13         4.      The agreement reduced Berkley's and Bluegreen's incentives and ability to

14  compete for employees and restricted employee mobility. The agreement thus harmed

15  Plaintiffs and other employees by lowering the salaries and benefits they might otherwise

16  have commanded, limiting their ability to secure better compensation and working

17  conditions, and deprived these employees of better job opportunities at the other company.

18         5.      The agreement between Berkley and Bluegreen is a naked restraint of trade

19  that is *per se* unlawful under Section I of the Sherman Act, 15 U.S.C. § 1. No elaborate

20  industry analysis is required to demonstrate the anti-competitive character of this

21  agreement.

22

## II.    JURISDICTION AND VENUE

6.      Plaintiffs, individually and on behalf of the proposed Class, bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Virginia Antitrust Act, § 59.1-9.5.

7.      Defendants hire specialized timeshare sales personnel and other employees throughout the United States, and develop and sell timeshare properties throughout the United States. Such activities, including the recruitment and hiring activities at issue in this Complaint, are in the flow of and substantially affect interstate commerce. The Court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331 and 1337 to award damages against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to prevent and restrain Defendants from violating Section 1 of the Sherman Act in the future.

8.      This Court has jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k).

9.      The Court also has personal jurisdiction over Defendants pursuant to Va. Code §8.01-328.1(A)(1) & (6) as this cause of action arose in part from Defendants transacting business and having interests in real property in this district and division.

10.     Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2), (c). Defendants routinely transact business in this district and a substantial part of the events that gave rise to this action occurred here.

## III.    INTRADISTRICT ASSIGNMENT

11.     Venue is proper in the Harrisonburg Division under Civil L.R. 2(b) because

Defendants routinely transact business in Rockingham County, and a substantial part of the events that gave rise to the action occurred in Rockingham County.

IV.    CHOICE OF LAW

12.    Virginia law applies to the claims of Plaintiffs and all Class members. Application of Virginia law is constitutional, and Virginia has strong interests in deterring unlawful business practices of resident corporations and compensating those harmed by activities occurring in and emanating from Virginia.

13.    Defendants negotiated, entered into, implemented, monitored, and enforced the unlawful agreement in Virginia. These illicit activities were centered within, and for the most part occurred within, Rockingham County and James City County, Virginia.

14.    Defendants actively concealed the existence of their unlawful agreement in Virginia. Defendants centered these concealment efforts in Rockingham County and James City County, Virginia.

15.    Plaintiffs' and Class members' relationship with Defendants is centered in Virginia. At least a majority of the proposed Class members reside in Virginia. Defendants maintained (and continue to maintain) places of business in Rockingham County and in James City County. Defendants employed at least a majority of class members in either Rockingham County or James City County.

16.    Defendants implemented and enforced the unlawful agreement in Virginia. As a result of Defendant's illicit conduct, Plaintiffs and class members suffered injuries in Virginia.

1    17.    For these reasons, among others, Virginia has significant contacts, and a

2    significant aggregation of contacts, with all parties and the acts alleged herein. Virginia's

3    substantial interests in this action far exceed those of any other state.

4

5    **V.    PARTIES**

6        **A.    PLAINTIFFS**

7    18.    Plaintiff Abigail Hanger is a resident of Virginia. From approximately May

8    2012 through October 2013, Ms. Hanger was a resident of Virginia and worked in

9    Rockingham County as a sales representative for Defendant Great Eastern Resort

10    Corporation. Ms. Hanger was injured in her business or property by reason of the violations

11    alleged herein.

12    19.    Plaintiff J.R. Collins is a resident of South Carolina. From approximately

13    2009 until 2013, Mr. Collins was a resident of Virginia and worked in Rockingham County

14    as a sales representative for Defendant Great Eastern Resort Corporation. Mr. Collins was

15    injured in his business or property by reason of the violations alleged herein.

16    20.    Plaintiff Chris Howard is a resident of Virginia. From approximately April

17    2000 through March 2008, and September 2008 through August 2013, Mr. Howard was a

18    resident of Virginia and worked in Rockingham County as a sales representative for

19    Defendant Great Eastern Resort Corporation. From approximately March 2008 through

20    July 2008, Mr. Howard was a resident of Virginia and worked in James City County as a

21    sales representative for Defendant Williamsburg Plantation. Mr. Howard was injured in his

22    business or property by reason of the violations alleged herein.

23    21.    Plaintiff Jeanette Alexander Collins is a resident of South Carolina. From

approximately 1999 until 2003, and from 2004 through the summer of 2013, Ms. Collins was a resident of Virginia and worked in Rockingham County as a sales representative for Defendant Great Eastern Resort Corporation. In 2003, Ms. Collins was a resident of Virginia and worked in James City County as a sales representative for Defendant Williamsburg Plantation. Ms. Collins was injured in her business or property by reason of the violations alleged herein.

22. Plaintiff Julia Fulwider is a resident of Virginia. From approximately 1999 through the spring of 2009, Ms. Fulwider was a resident of Virginia and worked in Rockingham County as a sales representative for Defendant Great Eastern Resort Corporation. Ms. Fulwider was injured in her business or property by reason of the violations alleged herein.

23. Plaintiff Steven Ferrell is a resident of Virginia. From approximately April of 2003 through December 2, 2012, Mr. Ferrell was a resident of Virginia and worked in Rockingham County as a sales representative or sales manager for Defendant Great Eastern Resort Corporation. Mr. Ferrell was injured in his business or property by reason of the violations alleged herein.

B. DEFENDANTS

24. Defendant The Berkeley Group, Inc. is a Florida corporation having its principal place of business in Fort Lauderdale, Florida. The Berkley Group is "one of the largest timeshare development, sales and marketing entities in the world." The Berkley Group manages the development, sales, and marketing operations for approximately 59 wholly or jointly owned timeshare resorts throughout the United States, at all times relevant to this Complaint, was intimately involved in managing the development, sales,

and marketing operations for GERC's and WPI's timeshare resorts in Virginia.

25.   Defendant Great Eastern Resort Corporation, Inc. ("GERC"), is a Virginia corporation having its principal place of business at 610 West Rio Road, Charlottesville, VA 22906. Great Eastern Resort Corporation is the developer of several timeshare resort properties in Rockingham County, Virginia, collectively known as Massanutten Resort, where it employs approximately 120 dedicated timeshare sales personnel.

26.   Defendant Williamsburg Plantation, Inc. ("WPI") is a Virginia corporation having its principal place of business in James City County. WPI owns and operates two timeshare resorts near colonial Williamsburg, where it employs approximately 120 dedicated timeshare sales personnel. WPI is a wholly owned subsidiary of The Berkley Group.

27.   The Berkley Group, GERC, and WPI share a common directorate, including the same President, COO, CFO, and Vice President of Sales, and the same corporate headquarters in Florida. In the agreement at issue in this Complaint, The Berkley Group, GERC, and WPI are referred to as the "Berkley Parties" and treated as a single entity for the purposes of the agreement. The Berkley Group played a central role in the negotiation, formation, monitoring and enforcement of the agreement, and communicated directly with Bluegreen concerning these matters on behalf of the other Berkley Parties. In keeping with that practice, and for the sake of clarity, the name "Berkley" as used herein refers to the Berkley Parties, individually or collectively.

## VI.   CLASS ACTION ALLEGATIONS

28.   Plaintiffs bring this action on behalf of themselves and all others similarly

situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons who were employed as timeshare sales personnel on a commission or part-commission basis in Virginia by one or more of the following: (a) Great Eastern Resort Corporation; (b) Williamsburg Plantation; (c) The Berkley Group; or (d) any affiliate, predecessor, or subsidiary of Great Eastern Resort Corporation, Williamsburg Plantation, or The Berkley Group, at any time during the period from October 16, 2007 through January 1, 2016 (the "Class Period"). "Timeshare sales personnel" includes employees having any of the following job titles: sales representative, sales manager, or sales director. Excluded from the Class are: project directors, corporate officers, members of the boards of directors, and senior executives of all Defendants.

29. These persons constitute a class so numerous that joinder is impracticable. Plaintiffs do not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendants. Based upon the nature of the trade and commerce involved, Plaintiffs believe that there are at least three hundred Class members, and that Class members are geographically dispersed throughout Virginia and the United States. Joinder of all members of the Class, therefore, is not practicable.

30. Joinder is also impracticable as Defendants currently employ many members of the proposed class. These persons are unlikely to pursue individual claims against Defendants for fear of losing their jobs.

31. Because Defendants acted uniformly in connection with all plaintiffs, this action presents questions of law and fact common to all members of the class, and which predominate over any questions affecting only individual members of the class.

32. The questions of law or fact common to the Class include but are not limited to:

      a.    whether the conduct of Defendants violated the Sherman Act or the Virginia Antitrust Act;

      b.    whether Defendants' no-hiring agreement with Bluegreen constitutes a *per se* violation of the Sherman Act or Virginia Antitrust Act;

      c.    whether Defendants' no-hiring agreement with Bluegreen is an unlawful restraint of trade in violation of the Sherman Act or Virginia Antitrust Act under an abbreviated or "quick look" rule of reason analysis;

      d.    whether Defendants' no-hiring agreement with Bluegreen is an unlawful restraint of trade in violation of the Sherman Act or Virginia Antitrust Act under a rule of reason analysis;

      e.    whether Defendants fraudulently concealed their conduct;

      f.    whether Defendants' no-hiring agreement unlawfully restrained trade, commerce, or competition for skilled labor between Defendants and their competitors;

      g.    whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury;

      h.    the difference between the total compensation Plaintiffs and the Class received from Defendants, and the total compensation Plaintiffs and the Class would have received in the absence of the unlawful agreement and conspiratorial acts alleged herein;

      i.    the type and measure of damages suffered by Plaintiffs and the Class.

1    33.    These and other questions of law and fact are common to the Class, and

2    predominate over any questions affecting only individual Class members.

3    34.    The impacts of the offenses committed by Defendants are common to all

4    plaintiffs. Plaintiffs' claims are typical of the claims of the Class. Each named Plaintiff has a

5    substantial financial interest in this action, and the interests of the named Plaintiffs are

6    neither coincident with nor adverse to the class they represent. Therefore, these named

7    Plaintiffs will adequately protect the interests of the class.

8    35.    Plaintiffs have retained counsel competent in antitrust litigation and class

9    action litigation to represent themselves and the Class.

10   36.    Defendants have acted on grounds generally applicable to the Class, thereby

11   making final injunctive relief appropriate with respect to the Class as a whole.

12   37.    Defendants utilize a rigid compensation structure that applies uniformly to

13   all or nearly all Class members. Therefore, class-wide evidence is capable of showing that

14   the agreement suppressed Class member compensation generally, and that this

15   suppression of compensation affected all or virtually all Class members.

16   38.    This class action is superior to the alternatives, if any, for the fair and

17   efficient adjudication of this controversy. Prosecution as a class action will eliminate the

18   possibility of repetitive litigation. There will be no material difficulty in the management of

19   this action as a class action. By contrast, prosecution of separate actions by individual Class

20   members would create the risk of inconsistent or varying adjudications, establishing

21   incompatible standards of conduct for Defendants.

22

## VII.   FACTS

### A.   TRADE AND COMMERCE

39.     During the Class Period, Defendants employed timeshare sales personnel in Virginia and throughout the United States, including this judicial district.

40.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

### B.   MARKET FOR TIMESHARE SALES PERSONNEL

41.     Companies in the same or similar industries often compete to hire and retain talented employees. This is particularly true in sales industries in which particular market expertise and specialized skills sought by one company can often be found at another company. Solicitation of skilled personnel from other companies is an effective method of competing for needed employees, as is the hiring of skilled personnel formerly employed by other companies.

42.     In a properly functioning and lawfully competitive labor market, Berkley and Bluegreen would compete for employees by soliciting and hiring the other company's sales personnel. Solicitation includes communicating directly in any manner with another firm's employee who has not otherwise applied for a job opening. Solicitation is a particularly effective recruiting method because current employees of other companies are often unresponsive to other recruiting strategies.

43.     In a properly functioning and lawfully competitive labor market, Berkley and Bluegreen would compete for employees by hiring skilled timeshare sales personnel formerly employed by the other company.

44. Defendants and other timeshare companies classify potential employees into two categories: first, those who are currently employed by rival firms and not actively seeking to change employers; and second, those who are actively seeking employment (either because they are unemployed, or because they are unsatisfied with their current employer).

45. Defendants and other timeshare companies value potential employees of the first category significantly higher than potential employees of the second category, because current satisfied employees tend to be more qualified, harder working, and more stable than those who are actively looking for employment.

46. In addition, a company searching for a new hire is eager to hire personnel with experience and proven skills in their field. Thus, Defendants and other timeshare companies value each other's sales personnel far higher than potential employees without verifiable skills in timeshare sales. Hiring personnel formerly employed by a rival allows the hiring company to reduce risk and increase the quality of its sales line, as timeshare sales personnel who succeed with one company are likely to succeed with a different timeshare company.

47. For these reasons and others, soliciting and hiring a rival's current and former employees are key competitive tools companies use to recruit employees, particularly employees with specialized skills and abilities.

48. The practice of solicitation increases transparency in the labor market and facilitates the flow of information between buyers (employers) and sellers (employees) of skilled labor services. This benefits employee compensation in a variety of ways. First, solicitation informs current employees about the compensation practices of rival

companies. This information provides the current employee with leverage to negotiate for better compensation with her current employer. When an employee receives an offer from a rival that exceeds her current compensation, she may accept it and move to the better paying employer, or use the offer to negotiate increased compensation from her current employer. In either case, solicitation facilitates competition among employers, and this competition allows employees to realize their true value on the market.

49. Second, the benefits of solicitation accrue even to employees who do not themselves receive offers. An employee who receives information about potential compensation from a rival firm will likely share this information with her colleagues. These employees may use the information themselves to negotiate pay increases or move to the rival employer, despite the fact that the rival did not contact them directly.

50. Third, soliciting a rival's employees provides information to the soliciting company regarding its rival's compensation practices. Increased information and transparency regarding compensation levels tends to increase compensation across all current employees, because there is pressure to match or exceed the highest compensation package offered by rivals in order to remain competitive.

51. Fourth, in a competitive market, employees benefit from the simple possibility of solicitation. When a company knows that a rival may recruit its employees, the company will preemptively increase the compensation of its employees to reduce the risk that a rival will be able to poach its employees by offering better pay.

52. In a properly functioning and lawfully competitive labor market, Berkley and Bluegreen would further compete by soliciting and hiring skilled personnel formerly employed by the other company. Like solicitation of current employees, this practice

promotes efficiency in the market. It benefits the hiring companies, who save training costs and reduce risk by investing in experienced personnel with proven skills. It ensures that open positions will be filled by the best-qualified personnel, and allows former employees to obtain jobs that utilize and adequately compensate their unique skills.

53. The practice of hiring a rival's former employees also commonly benefits all current employees. First, when a company knows that a rival may hire its former employees, the company will preemptively increase compensation and improve working conditions to reduce the risk that employees will leave to seek better jobs with a rival.

54. Second, when a company knows that a rival may hire its former employees, the company will be less likely to engage in "seasonal thinning" – the practice of repeatedly terminating and rehiring personnel in response to temporary market conditions or office politics.

55. Third, like solicitation, the practice of hiring former rival employees facilitates the flow of information between buyers (employers) and sellers (employees) of skilled labor services. This benefits employee compensation. A former employee who goes to work for a rival will likely share information about the rival's compensation practices with her former colleagues. These employees may use the information to negotiate pay increases with their current employer, or move to the rival employer themselves to obtain better compensation. In either case, competitive hiring facilitates competition among employers, and this competition allows employees to realize their true value on the market.

56. The compensation effects of solicitation and competitive hiring are not limited to the particular employees who are solicited or hired, or to the particular individuals who would have received offers or jobs but for the anticompetitive agreement

at issue in this Complaint. Instead, the effects of solicitation and competitive hiring, and the effects of a conspiracy that eliminates these forms of competition, commonly impact all paid employees of the participating companies.

57. Defendants carefully monitor and manage their internal compensation to achieve certain goals, including:

a. maintaining approximate compensation parity among employees within the same employment categories (for example, among sales representatives);

b. maintaining certain compensation relationships among employees across different employment categories (for example, among sales representatives relative to sales managers);

c. maintaining employee productivity;

d. retaining employees; and

e. attracting new and talented employees.

58. To accomplish these objectives, Defendants set baseline compensation levels for different employee categories that apply to all employees within those categories. Defendants also compare baseline compensation levels across different employee categories. Defendants update baseline compensation levels regularly.

59. Defendants rarely negotiate compensation levels with individual sales employees. Even when they do, these negotiations occur from a starting point of the pre-existing and pre-determined baseline commission rate. The eventual compensation received by any particular sales employee is either entirely determined by the baseline rate, or is profoundly influenced by it. In either case, suppression of the baseline commission rate will result in suppression of total compensation.

60.     Thus, under competitive and lawful conditions, Berkley and Bluegreen would use solicitation and competitive hiring as two of their most important tools for recruiting and retaining skilled labor. The use of solicitation and competitive hiring among Defendants and their competitors commonly increases total compensation and improves mobility of all Defendants' employees.

61.     Berkley's no-hiring and no-solicitation agreement with Bluegreen eliminated this competition. The agreement harmed and continues to harm employees by reducing the salaries, benefits, and employment opportunities they might otherwise have earned if competition had not been eliminated.

62.     The agreement also misallocated labor between Berkley and Bluegreen – companies that succeed based in no small measure on the talent of their sales personnel. In a properly functioning labor market, employers compete to attract the most valuable talent for their needs. Competition among employers for skilled employees may benefit employees' salaries and benefits, and facilitates employee mobility. The no-hiring agreement between Berkley and Bluegreen distorted this competitive process and likely resulted in some of Berkley's and Bluegreen's employees remaining in jobs that do not fully utilize or adequately compensate their valuable skills. Instead of working harder to acquire this critical and scarce talent, Berkley and Bluegreen entered into the no-hiring agreement to protect their own interests at the expense of their employees.

63.     The conspiracy began with a pair of legal actions brought by GERC and WPI after talented sales employees left GERC and WPI to take better paying jobs with

1 Bluegreen.[2] The employees responded by filing collective actions against GERC and WPI

2 for violating the minimum wage and overtime provisions of the Fair Labor Standards Act.

3 The Virginia courts dismissed GERC's and WPI's claims against the employees, after Judge

4 Lane of the Rockingham County Circuit Court held that the non-compete provision GERC

5 and WPI sought to enforce was overly broad, unlawful, and void.[3]

6      64.     With the FLSA collective actions gathering plaintiffs in Virginia, Berkley

7 Group brought a seemingly unrelated trademark action against Bluegreen in Florida.[4]

8 Bluegreen initially sought a limited settlement agreement confined to resolving the Florida

9 case. Bluegreen ultimately agreed to the expansive no-solicitation and no-hiring

10 agreement described herein, in large part to placate Berkley Group's President Ms. Foster,

11 who was, at the time, also serving as President of GERC and WPI, and who believed that

12 such an agreement would serve Berkley's "interest in containing FLSA scrutiny of its

13 compensation practices." These companies elevated the interests of Ms. Foster above the

14 welfare of their own employees.

15      65.     Neither Berkley Group, GERC, nor WPI publicly disclosed their agreement

16 with Bluegreen or took any steps to ensure that employees affected by the agreement knew

17 of its existence, or how it would impact them. Disclosure of the agreement could have

18 created substantial legal problems for Berkley under Virginia law and significant

19 embarrassment for the executives and other individuals who entered into, and monitored

20 compliance with, the agreement on behalf of Berkley Group, GERC, and WPI. Many

---

[2] *Great Eastern Resort Corp. v. Bluegreen Corp., et. al.*, CL06-00600 (Va. Cir. 2006) (Rockingham); *Williamsburg Plantation, Inc. v. Bluegreen Corp., et. al.*, CL06000441-00 (Va. Cir. 2006) (James).
[3] *Great Eastern Resort Corp. v. Bluegreen Corp., et al.*, CL06-00600, Letter Opinion & Order on Demurrer (August 1, 2007) (J. Lane).
[4] *The Berkley Group, Inc. v. Bluegreen Corporation, et al.*, 07-80391 (S.D. Fl. 2007).

1  Berkley Group, GERC, and WPI employees reside in Virginia, a state with a strong public

2  policy favoring employee movement by, among other things, disfavoring the enforcement

3  of "non-compete" agreements, making it a crime for a company to blacklist or attempt to

4  blacklist its former employees, Va. Code § 40.1-27, and prohibiting restraints of trade that

5  act or tend to act to decrease competition. Virginia law provides that "Every contract,

6  combination or conspiracy in restraint of trade or commerce of this Commonwealth is

7  unlawful." Va. Code § 59.1-9.5.

8

9  **C.    THE UNLAWFUL AGREEMENT**

10      66.    On October 16, 2007, senior executives at Berkley and Bluegreen entered

11  into a written agreement to restrict their ability to recruit and hire employees of the other

12  company. The agreement effectively prevented Bluegreen from hiring any current or

13  former Berkley sales personnel at all without Berkley's written permission, even those that

14  approached Bluegreen for a job. As alleged in more detail below, the agreement was

15  entered into and enforced at the most senior levels of each company.

16      67.    The agreement prohibited either company from hiring any current or former

17  employee of the other who was subject to a confidentiality, non-solicitation, or non-

18  compete covenant.  The agreement further required each company to prohibited either

19  company from hiring any current or former employee of the other who was unable to prove

20  that she was not subject to a confidentiality, non-solicitation, or non-compete covenant.

21      68.    The agreement expressly required Bluegreen to terminate any former

22  employee of GERC, WPI, or other Berkley Group related entity, who still had either a non-

23  competition agreement **or** a non-solicitation or confidentiality agreement in effect. Thus,

before Bluegreen could consider a former Berkley employee's application for employment, Berkley had to provide Bluegreen with a clear and express written waiver of the provision in the agreement prohibiting the employment of the former Berkley employee during the pendency of the non-solicitation and confidentiality provisions of his employment agreement with Berkley.

69.     This agreement was not limited by geography or time period, and was not ancillary to any legitimate collaboration between Berkley and Bluegreen. The agreement potentially covers all employees of Berkley or Bluegreen. It specifically targeted Berkley's timeshare sales personnel, all of whom were required to sign forms containing confidentiality, non-solicitation, and non-compete clauses. Berkley revised these clauses periodically during the Class Period, and each time required all sales personnel to sign a new form containing the revised clauses.

70.     The agreement's no-hiring restraint had no set temporal or geographic limits. By design, the scope of each firm's no-hiring obligation was dictated by the broadest post-employment restraint in the other firm's standard at-will employment agreement. For instance, in 2007, Berkley required each of its sales employees to sign a form containing a non-compete and several confidentiality and non-solicitation clauses. The non-compete extended for one year after the employment with Berkley ended and had a geographic radius of 85 miles. The confidentiality and non-solicitation clauses extended for two years post-employment and had no geographic limitation.  The no-hiring agreement therefore prohibited Bluegreen from hiring any Berkley sales employees, at any location, for at least two years after the end of their employment with Berkley.

71.     The no-hiring agreement thus allowed either company to expand the no-

CLASS ACTION COMPLAINT

hiring restraint by simply revising its employment agreement. If Berkley, for example, changed the duration of its "non-solicitation of supplier/vendors" clause from two years to three, the no-hiring agreement would prevent Bluegreen from hiring Berkley's sale employees for at least three years after the end of their employment with Berkley. Put simply, the agreement allowed either party to prevent their employees from ever working for the other party.

72. Senior executives of Berkley Group, GERC, and WPI actively concealed their unlawful agreement with Bluegreen. Employees of Berkley Group, GERC, and WPI were not aware of, and did not agree to, the terms of the agreement between Berkley and Bluegreen.

73. After entering into the agreement, senior management of both Berkley and Bluegreen monitored compliance and policed potential violations. For instance, in April 2011, Jennifer Cohen, Bluegreen's Senior Corporate Counsel and Vice President of Human Resources, contacted Berkley's corporate headquarters about a former WPI sales employee whom Bluegreen sought to hire. This employee had left WPI in August 2009. During his employment with WPI, the employee had signed WPI's standard at-will employment agreement, which, at the time, contained a one-year non-compete and several "confidentiality" and "non-solicitation" clauses of longer durations. The non-compete expired in August 2010. Berkley's no-hiring agreement with Bluegreen prevented Bluegreen from hiring this employee in April 2011, because the confidentiality and non-solicitation clauses had not yet expired.

74. On April 4, 2011, Bluegreen's Ms. Cohen contacted counsel for Berkley "in an effort to make sure the parties were on the same page with compliance." Ms. Cohen

sought to clarify Bluegreen's obligations under the no-hiring agreement. "Please let me know by tomorrow what your position is with regard to [the former WPI employee's potential] employment," Ms. Cohen wrote, "as well as your position in general regarding Berkley's interpretation of paragraph 4 of the Global Settlement Agreement."

75.    Two days later, counsel for Berkley informed Ms. Cohen that the no-hiring agreement prevented Bluegreen from hiring the potential employee, who was not subject to a non-compete, because a non-solicitation clause in his employment agreement with WPI had not yet expired: "[Berkley] is not interested in re-negotiating the terms of this agreement. The agreement clearly provides that neither party may hire a former employee of the other who is subject to a non-competition <u>or</u> non-solicitation agreement. These provisions were part of the deal, reviewed by counsel for both sides, and signed off by both parties." (emphasis added).

76.    In response, Ms. Cohen assured Berkley that Bluegreen was "not looking to re-negotiate," and that "Bluegreen will agree to honor Berkley's interpretation of the GSA (meaning that Bluegreen will not hire an employee who it knows is still covered by a Berkley non-compete or non-solicitation), and in return we expect Berkley to not hire an employee who it knows is still covered by a Bluegreen non-compete OR non-solicitation." (emphasis in original).

77.    To ensure its compliance with the agreement, Bluegreen did not hire any former Berkley sales employees, regardless of how long ago their employment with Berkley ended, without the written approval of Berkley's senior management. Thus, when Berkley informed Bluegreen that "the Berkley Parties will not approve the hiring by Bluegreen Corporation" of a potential employee, Bluegreen did not hire the employee.

1   And when Berkley did not respond to a request for written approval, Bluegreen did not hire

2   the employee.

3       78.    The agreement ended recruitment and hiring between these competing

4   employers and profoundly chilled employee mobility. Throughout the course of the

5   agreement, Bluegreen repeatedly declined opportunities to hire current or former Berkley

6   sales employees, even when Bluegreen had open positions, when the potential employee

7   was highly qualified, and Bluegreen "would have loved to bring [him] on."

8       79.    The agreement allowed Berkley to convert employees' unique skills into

9   firm-specific human capital, without the employees' knowledge or consent, by denying

10  workers the opportunity to apply their skills outside of Berkley. In an industry where the

11  default rule is at-will employment and employees have no expectation of long-term job

12  security, this involuntary transfer of property rights is not just inequitable. It is repugnant to

13  the virtues of fair and free competition on the merits that the antitrust laws exist to protect.

14

15  **D.    IMPACTS OF THE CONSPIRACY ON PLAINTIFFS AND THE CLASS**

16      80.    Berkley and Bluegreen agreed to eliminate competition between them for

17  skilled labor by entering into the expansive no-solicitation and no-hiring agreement

18  described herein. These rival firms devised, implemented, and policed the agreement with

19  the intent and effect of suppressing the compensation and mobility of valuable timeshare

20  sales personnel.

21      81.    But for this unlawful agreement, Bluegreen would have solicited and hired

22  current and former Berkley sales employees to work for Bluegreen at its timeshare resorts

23  in Gordonsville and James City County, Virginia. Instead, pursuant to the agreement,

1    Bluegreen (from its corporate headquarters in Boca Raton, Florida) directed its site-level

2    managers and senior employees with hiring or recruiting responsibilities not to recruit

3    Berkley sales employees. To ensure compliance with the agreement, Bluegreen did not hire

4    former Berkley employees, even those that approached Bluegreen for a job, without

5    written permission from Berkley's senior management. Thus, when Berkley informed

6    Bluegreen that "the Berkley Parties will not approve the hiring by Bluegreen Corporation"

7    of a potential employee, Bluegreen did not hire the employee. And when Berkley did not

8    respond to a request for written approval, Bluegreen did not hire the employee.

9        82.     These anticompetitive effects were the purpose of the agreement, and

10    Defendants succeeded in lowering the compensation and mobility of employees below

11    what would have prevailed in a lawful and properly functioning labor market.

12        83.     The agreement between Berkley and Bluegreen was an ideal tool to suppress

13    employee compensation. Whereas an agreement to fix specific and individual

14    compensation packages would be hopelessly complex and impossible to implement,

15    monitor, and police, eliminating entire categories of competition for skilled labor (that

16    affected the compensation and mobility of all employees in a common and predictable

17    fashion) was simple to implement and easy to enforce.

18        84.     The agreement between Berkley and Bluegreen effectively diminished the

19    availability of information to sales personnel about alternative employers, including the

20    compensation packages and benefits offered by such employers. Without this information,

21    employees had no way of identifying better job opportunities, and no way to know that

22    their current employer did not pay a competitive wage. Lack of access to information about

23    a rival company's compensation practices also prevented employees from having sufficient

information to bargain with their current employer for higher compensation.

85.     Conversely, to "help enforce th[e] agreement," Berkley and Bluegreen agreed to require that job applicants disclose a copy of any employment agreement they had signed with the other party. This practice allowed Berkley and Bluegreen to share information about one another's commission rates and to monitor each other's compensation packages.

86.     Through the execution and enforcement of this agreement, Berkley and Bluegreen colluded as rival oligopsonists to suppress competition. The agreement reduced Berkley's and Bluegreen's incentives and ability to compete for employees and restricted employees' mobility. The agreement disrupted the normal functioning of wage setting and hiring of skilled timeshare sales personnel, and prevented sales employees from realizing the value of their skills on the market.

87.     The agreement effectively eliminated competition for skilled labor services, including the valuable timeshare sales services at issue in this Complaint. The agreement thus harmed Plaintiffs and the Class by lowering the salaries and benefits they might otherwise have commanded, artificially suppressing their compensation below competitive levels, limiting their ability to secure better compensation and working conditions, and depriving these employees of better job opportunities at the other company.

88.     This agreement is manifestly anticompetitive. It eliminated a significant form of competition to attract skilled timeshare sales employees, and disrupted the normal price-setting mechanisms that apply in the labor setting. Overall, it substantially diminished competition to the detriment of the affected employees, whom it deprived of competitively important information and access to better job opportunities.

89.     The agreement is not ancillary to any legitimate collaboration.

90.     The no-hiring agreement between Berkley and Bluegreen is a naked restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Virginia Antitrust Act, Va. Code § 59.1-9.5. No elaborate analysis of the industry is necessary to demonstrate this agreement's anticompetitive character.

91.     The no-hiring agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Va. Code § 59.1-9.5 under an abbreviated or "quick look" rule of reason analysis. The principal tendency of the agreement between Berkley and Bluegreen is to restrain competition, as the nature of the restraint is obvious and the agreement has no legitimate pro-competitive justification. Even an observer with a rudimentary understanding of economics could therefore conclude the agreement would have an anticompetitive effect on employees and harm the competitive process.

92.     The no-hiring agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Va. Code § 59.1-9.5 under a full rule of reason analysis. The principal tendency of the agreement between Berkley and Bluegreen is to restrain competition, and the anti-competitive impacts of this restraint far outweigh any purportedly pro-competitive effects.

93.     Without this class action, Plaintiffs and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

# COUNT ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

94. Plaintiffs, individually and on behalf of all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

95. Berkley and Bluegreen are direct competitors for employees, including the specialized timeshare sales personnel covered by the agreement at issue here. Berkley and Bluegreen entered into a naked no-solicitation and no-hiring agreement, thereby reducing their ability and incentive to compete for these employees. This agreement suppressed competition between Berkley and Bluegreen, thereby limiting affected employees' ability to secure better compensation, benefits, and working conditions.

96. Berkley and Bluegreen entered into and enforced an unlawful agreement in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning no later than October 16, 2007 and continuing at least through November 2013, these companies engaged in a continuing trust in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

97. Berkley and Bluegreen devised, monitored, and enforced the agreement with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) substantially eliminating competition among Defendants and their direct competitors for skilled labor services.

98. This agreement was not limited by geography, job function, or time period, and was not ancillary to any legitimate collaboration between Berkley and Bluegreen.

1    99.    As a direct and proximate result of Berkley's and Bluegreen's conspiracy to

2    restrain trade and eliminate competition for skilled labor, members of the Class have

3    suffered injury to their property and have been deprived of the benefits of free and fair

4    competition on the merits.

5    100.    The unlawful agreement between Berkley and Bluegreen has had the

6    following effects, among others:

7         a.    competition for skilled timeshare sales employees has been

8    suppressed, restrained, and eliminated; and

9         b.    Plaintiffs and members of the Class have received lower

10   compensation than they otherwise would have received in the absence of this unlawful

11   agreement, and, as result, have been injured in their property and have suffered damages

12   in an amount according to proof at trial.

13   101.    Plaintiffs and members of the Class suffered antitrust injury in the form of

14   artificially reduced compensation, decreased ability to secure better compensation,

15   benefits, and working conditions, and other injuries caused by Berkley's anticompetitive

16   agreement with Bluegreen.

17   102.    The acts done by each Defendant as part of, and in furtherance of, their

18   unlawful agreement were authorized, ordered, or done by their respective officers,

19   directors, agents, employees, or representatives while actively engaged in the management

20   of each Defendant's affairs.

21   103.    Berkley's agreement with Bluegreen is *per se* unlawful under Section I of the

22   Sherman Act, 15 U.S.C. § 1. No elaborate industry analysis is required to demonstrate the

23   anticompetitive character of this agreement.

104.    The agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act under an abbreviated or "quick look" rule of reason analysis. The principal tendency of the agreement is to restrain competition, as the nature of the restraint is obvious and the agreement has no legitimate pro-competitive justification. Even an observer with a rudimentary understanding of economics could therefore conclude the agreement would have an anticompetitive effect on employees and harm the competitive process.

105.    The no-hiring agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act under a full rule of reason analysis. The principal tendency of the agreement between Berkley and Bluegreen is to restrain competition, as the nature of the restraint is obvious, and the anti-competitive impacts of this restraint far outweigh any purportedly pro-competitive effects.

106.    Plaintiffs have suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of the unlawful restraints created by Berkley's agreement with Bluegreen.

107.    Accordingly, Plaintiffs and members of the Class pray for judgment in their favor and against Defendants:

A.    Declaring that Defendants' no-solicitation and no-hiring agreement with Bluegreen is an illegal restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1;

B.    Awarding Plaintiffs treble damages, plus prejudgment interest, costs and reasonable attorney fees, pursuant to 15 U.S.C. § 15; and

C.    Permanently enjoining Defendants from ever again entering into a similar agreement in violation of Section 1 of the Sherman Act.

## COUNT TWO

### VIOLATION OF THE VIRGINIA ANTITRUST ACT

108.     Plaintiffs, individually and on behalf of all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

109.     Berkley and Bluegreen are direct competitors for employees, including the specialized timeshare sales personnel covered by the agreement at issue here. Berkley and Bluegreen entered into a naked no-solicitation and no-hiring agreement, thereby reducing their ability and incentive to compete for these employees. This agreement suppressed competition between Berkley and Bluegreen, thereby limiting affected employees' ability to secure better compensation, benefits, and working conditions.

110.     Berkley and Bluegreen entered into and enforced an unlawful agreement in restraint of the trade and commerce described above in violation of the Virginia Antitrust Act, Va. Code § 59.1-9.5. Beginning no later than October 16, 2007 and continuing at least through November 2013, these companies engaged in a continuing trust in restraint of trade and commerce in violation of Va. Code § 59.1-9.5.

111.     Berkley and Bluegreen designed, monitored, and enforced the agreement with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) substantially eliminating competition among Defendants and their direct competitors for skilled labor services.

112.     This agreement was not limited by geography, job function, or time period,

1 and was not ancillary to any legitimate collaboration between Berkley and Bluegreen.

2     113. As a direct and proximate result of Berkley's and Bluegreen's conspiracy to

3 restrain trade and eliminate competition for skilled labor, members of the Class have

4 suffered injury to their property and have been deprived of the benefits of free and fair

5 competition on the merits.

6     114. The unlawful agreement between Berkley and Bluegreen has had the

7 following effects, among others:

8         a. competition for skilled timeshare sales employees has been

9 suppressed, restrained, and eliminated; and

10         b. Plaintiffs and members of the Class have received lower

11 compensation than they otherwise would have received in the absence of this unlawful

12 agreement, and, as result, have been injured in their property and have suffered damages

13 in an amount according to proof at trial.

14     115. Plaintiffs and members of the Class suffered antitrust injury in the form of

15 artificially reduced compensation, decreased ability to secure better compensation,

16 benefits, and working conditions, and other injuries caused by Berkley's anticompetitive

17 agreement with Bluegreen.

18     116. The acts done by each Defendant as part of, and in furtherance of, their

19 unlawful agreement were authorized, ordered, or done by their respective officers,

20 directors, agents, employees, or representatives while actively engaged in the management

21 of each Defendant's affairs.

22     117. Berkley's agreement with Bluegreen is *per se* unlawful under the Virginia

23 Antitrust Act, Va. Code § 59.1-9.5. No elaborate industry analysis is required to

Case 5:13-cv-00113-MFU-JCH    Document 1    Filed 12/11/13    Page 32 of 36    Pageid#: 32

demonstrate the anticompetitive character of this agreement.

118.    The agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Va. Code § 59.1-9.5 under an abbreviated or "quick look" rule of reason analysis. The principal tendency of the agreement is to restrain competition, as the nature of the restraint is obvious and the agreement has no legitimate pro-competitive justification. Even an observer with a rudimentary understanding of economics could therefore conclude the agreement would have an anticompetitive effect on employees and harm the competitive process.

119.    The no-hiring agreement between Berkley and Bluegreen is also an unreasonable restraint of trade that is unlawful under Va. Code § 59.1-9.5 under a full rule of reason analysis. The principal tendency of the agreement between Berkley and Bluegreen is to restrain competition, as the nature of the restraint is obvious, and the anti-competitive impacts of this restraint far outweigh any purportedly pro-competitive effects.

120.    Berkley's agreement with Bluegreen constitutes a willful and flagrant violation of VA. Code § 59.1-9.5.

121.    Plaintiffs have suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of the unlawful restraints created by Berkley's agreement with Bluegreen.

122.    Accordingly, Plaintiffs and members of the Class pray for judgment in their favor and against Defendants:

A.    Declaring that Defendants' no-solicitation and no-hiring agreement with Bluegreen is an illegal restraint of trade in violation of the Virginia Antitrust Act, VA. Code § 59.1-9.5;

1        B.      Declaring that Defendants' agreement with Bluegreen constitutes a willful

2 and flagrant violation of VA. Code § 59.1-9.5;

3        C.      Awarding Plaintiffs and the Class treble damages, plus costs of suit and

4 reasonable attorney fees, pursuant to Va. Code § 59.1-9.12(b); and

5        D.      Permanently enjoining Defendants from ever again entering into a similar

6 agreement in violation of Section 1 of the Sherman Act.

7

8 **PRAYER FOR RELIEF**

9        WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and

10 that of the Class:

11        A.      Ordering that this action may be maintained as a class action, with Plaintiffs

12 as the designated Class representatives and their counsel as Class counsel;

13        B.      Declaring that Defendants' anticompetitive agreement with Bluegreen

14 Corporation is an illegal restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 and

15 the Virginia Antitrust Act, VA. Code § 59.1-9.5;

16        C.      Declaring that Defendants' anticompetitive agreement with Bluegreen

17 Corporation constitutes a willful and flagrant violation of the Virginia Antitrust Act, VA.

18 Code § 59.1-9.5;

19        D.      Permanently enjoining Defendants from ever again entering into a similar

20 agreement in violation of the antitrust laws;

21        E.      Awarding Plaintiffs and the Class treble damages, plus prejudgment interest,

22 costs, and reasonable attorney fees, pursuant to 15 U.S.C. §15 and VA Code § 59.1-9.12(b);

23 together with

1  F.  such other and further relief as the Court may deem just.

2

3  **DEMAND FOR JURY TRIAL**

4  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for

5  all claims and issues so triable.

Respectfully submitted,

ABIGAIL HANGER
J.R. COLLINS
CHRIS HOWARD
JEANETTE ALEXANDER COLLINS
JULIA FULWIDER
STEVEN FERRELL

By Counsel

Dated:  December 11, 2013

_____/s/ Timothy Coffield_____
Timothy Coffield (VSB No. 83430)
5374 Gordonsville Road
Keswick, VA 22947
p:  434 218 3133
tc@coffieldlaw.com

Counsel for Plaintiffs and the Proposed Class

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true copies of the foregoing Complaint were served upon defendants or their registered agents at the following addresses:

THE BERKLEY GROUP, INC.
Rebecca Foster
 Registered Agent
2626 E. Oakland Park Blvd.
Ft. Lauderdale, FL 33306

GREAT EASTERN RESORT CORPORATION, INC.
Clark & Bradshaw PC
Registered Agent
92 N Liberty St.
Harrisonburg, VA 22802

WILLIAMSBURG PLANTATION, INC.
ECR Services LLC
Registered Agent
16 S Second St,
Richmond, VA 23219

This is the 11th day of December, 2013.

_____
 /s/ Timothy Coffield

Timothy Coffield
Counsel

1