CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 2 8 2015

JULIA C DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

ABIGAIL HANGER, <u>et al.</u>,     )
                               )
      **Plaintiffs,**        )
**v.**                         )     **Civil Action No 5:13-cv-113**
                               )
**THE BERKLEY GROUP, INC.,** <u>et al.</u>,  )  **By: Michael F. Urbanski**
                               )        **United States District Judge**
      **Defendants.**     )

## <u>MEMORANDUM OPINION</u>

This matter is before the court on defendants' motion to dismiss plaintiffs' amended complaint. Dkt. # 79. Plaintiffs allege that defendants entered into and enforced an agreement restraining competition for each other's employees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; the Virginia Antitrust Act, Va. Code § 59.1-9.5; and the Virginia Business Conspiracy Act, Va. Code § 18.2-499. The issues have been fully briefed, and oral argument was held on January 8, 2015. Because plaintiffs' allegations do not plausibly allege an agreement that unreasonably restrains trade in violation of Section 1 of the Sherman Act or the Virginia Antitrust Act, and plaintiffs' personal employment interests are not subject to redress under the Virginia Business Conspiracy Act, defendants' motion must be **GRANTED** and the amended complaint dismissed.

### I.

Abigail Hanger, J.R. Collins, Chris Howard, Jeanette Alexander Collins, Steven Ferrell, and Matthew Wolf ("plaintiffs")[1] all worked as at-will sales representatives for defendant Great Eastern Resort Corporation ("Great Eastern") at its Massanutten Resort in Rockingham County,

---

[1] Plaintiffs claim to bring this suit on behalf of themselves and all others employed as sales representatives by one or more of the defendants for at least 90 days beginning on or after February 5, 2010. Because plaintiffs' amended complaint fails to state a claim upon which relief can be granted, class certification need not be addressed.

Virginia. Am. Compl., Dkt. # 71, at ¶¶ 24–29. Chris Howard currently works as a sales representative for defendant Williamsburg Plantation, Inc., ("Williamsburg Plantation") and Jeanette Alexander Collins worked as a sales representative for Williamsburg Plantation in the past. Id. at ¶¶ 26–27. Defendant The Berkley Group, Inc. ("Berkley Group") shares a common directorate and corporate headquarters with Great Eastern and Williamsburg Plantation and manages the development, sales, and marketing operations of Great Eastern's and Williamsburg Plantation's Virginia resorts.[2] Id. at ¶¶ 30, 33.

At its Massanutten and Williamsburg, Virginia timeshare resorts, Berkley Group employs timeshare salespersons. Berkley Group requires these salespersons to sign an employment agreement containing non-compete, confidentiality, and non-solicitation clauses that, over time, have varied in the time periods and geographic regions covered. Id. at ¶¶ 76, 77. Each of the plaintiffs each entered into an employment agreement containing restrictive covenants against competition for a period of one (1) year within an eighty-five (85) mile radius of their place of employment and against the disclosure of confidential information or solicitation of employees, customers, suppliers, or vendors for two (2) years.[3] Def.'s Mem. In Supp. of Mot. to Dismiss, Ex. A, Dkt. # 80-1.

In 2006, certain Berkley Group sales representatives from Massanutten and Williamsburg, not including the plaintiffs, accepted employment with Bluegreen Corporation ("Bluegreen"), the owner and operator of timeshare resorts in Louisa County and Williamsburg,

---

[2] As appropriate, the court will refer collectively to defendants as "Berkley Group."

[3] It is worth noting that plaintiffs do not challenge the legal validity of their non-competition, non-solicitation and confidentiality agreements with Berkley Group. Nor could they, as the agreements are reasonably limited in substantive scope, time and geography. For example, the non-compete provision is limited in its substantive scope to "performing the same or substantially similar duties they performed for [the Berkley Group resort] in the six (6) months prior to their departure"; in temporal scope to one year; and in geographic scope to an eighty-five (85) mile radius of the Berkley Group resort location where they worked in the six (6) months prior to their departure. Am. Compl., Dkt. No. 71, at ¶ 77.

2

Virginia. Challenging the legality of these defections, Berkley Group filed lawsuits against Bluegreen in Virginia state court alleging tortious interference with contract and statutory business conspiracy.[4] Am. Compl., Dkt. # 71, at ¶ 69. In addition, Berkley Group sued Bluegreen in federal court in Florida for trademark infringement, unfair competition and unjust enrichment.[5] Ultimately, Berkley Group agreed with Bluegreen to settle all three lawsuits in a Global Settlement Agreement ("GSA") dated October 16, 2007. Id. at ¶ 70.[6]

The GSA had a number of provisions, including payment of substantial monies by Bluegreen (¶ 1); the dismissal of the lawsuits (¶ 2); the transfer of 2,000 Florida timeshare prospects to the Berkley Group (¶ 3); a non-compete acknowledgement and notice provision (¶ 4); and mutual releases (¶ 5).

In this lawsuit, plaintiffs contend ¶ 4 of the GSA violates the antitrust laws. Paragraph 4 states:

> 4. Each party hereto acknowledges that the Berkley Parties and their affiliates, and the Bluegreen Parties and their affiliates, may enter into written employment agreements with their respective employees, which may contain non-competition, non-solicitation or confidentiality provisions. The Berkley Parties (for themselves and their affiliates) and the Bluegreen Parties (for themselves and their affiliates) agree to honor each other's non-competition, non-solicitation and confidentiality agreements of which they have actual knowledge and are contained in written agreements that have not been held unenforceable by a court of competent jurisdiction as to the particular employee. The Bluegreen Parties

---

[4] Great Eastern Resort Corp. v. Bluegreen Corp., et al., CL06-00600 (Va. Cir. 2006) (Rockingham County); Williamsburg Plantation, Inc. v. Bluegreen Corp., et al., CL06000441-00 (Va. Cir. 2006) (James City County).

[5] The Berkley Group, Inc. v. Bluegreen Corp., et al., Case No. 07-8039 (S.D. Fl. 2007).

[6] Plaintiffs refer throughout their Amended Complaint to the GSA but did not attach it as an exhibit. Defendants attached the GSA as Exhibit A to their Memorandum in Support of Defendants' Partial Motion to Dismiss. Dkt. # 14-1. In considering a Rule 12(b)(6) motion, the court may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Plainly, the GSA is integral to the complaint, and no issue has been raised as to its authenticity. Therefore, the court will consider the GSA attached to defendants' motion to dismiss in considering the Rule 12(b)(6) motion.

3

agree not to challenge in a judicial proceeding a confidentiality, non-competition or non-solicitation provision contained in any employment agreement between an employee and a Berkley party or to assist any person in challenging any such provision. The Berkley Parties agree not to challenge in a judicial proceeding a confidentiality, non-competition or non-solicitation provision contained in any employment agreement between an employee and a Bluegreen party or to assist any person in challenging any such provision.

To help to enforce this agreement, the Berkley Parties and the Bluegreen Parties shall, and shall cause their affiliates to, include in their pre-employment application process written questions that require the applicant to provide the name of his or her current and previous employers, and to disclose whether he or she has ever entered into a written employment agreement that included a non-competition, non-solicitation or confidentiality agreement or other employment-related restrictive covenant. The Berkley Parties (for themselves and their affiliates) and the Bluegreen Parties (for themselves and their affiliates), agree that, in the event that any Berkley Party or affiliate or Bluegreen Party or affiliate hires a new employee subject to either a non-competition, non-solicitation or confidentiality agreement that has not been declared unenforceable by a court of competent jurisdiction as to such employee, the hiring party shall terminate the newly-hired employee within 10 days after it receives written notice from the other party of such non-competition or non-solicitation agreement, accompanied by a true copy of such agreement, and such termination shall be the exclusive remedy for such hiring.

The Amended Complaint alleges that after the settlement, senior management of the

Berkley Group and Bluegreen monitored compliance with the GSA and corresponded about

violations of its terms. Am. Compl., Dkt. # 71, at ¶ 80. For example, plaintiffs allege that in

April 2011, Bluegreen refused to hire an applicant who previously entered into an employment

agreement with Berkley Group's Williamsburg Plantation resort, despite the fact that he left

Williamsburg Plantation's employment in August 2009 and his non-compete expired in August

2010, because of the confidentiality and non-solicitation clauses of longer duration. Id. In

making the decision not to hire the applicant, Bluegreen sought the Berkley Group's "position"

4

with regard to the former employee and its "interpretation of paragraph 4 of the [GSA]." Id. at

¶ 81. Berkley Group's counsel responded that

> [Berkley] is not interested in re-negotiating the terms of this agreement. The agreement clearly provides that neither party may hire a former employee of the other who is subject to a non-competition or non-solicitation agreement. These provisions were part of the deal, reviewed by counsel for both sides, and signed off by both parties.

Id. at ¶ 82. Bluegreen replied that it

> will agree to honor Berkley's interpretation of the GSA (meaning that Bluegreen will not hire an employee who it knows is still covered by a Berkley non-compete or non-solicitation), and in return we expect Berkley to not hire an employee who it knows is still covered by a Bluegreen non-compete OR non-solicitation.

Id. at ¶ 83 (emphasis in original).

Plaintiffs allege that the GSA "ended recruitment and hiring between these competing employers and profoundly chilled employee mobility. Throughout the course of the agreement, Bluegreen repeatedly declined opportunities to hire current or former Berkley sales employees." Id. at ¶ 85. Plaintiffs allege that the GSA disrupted the normal functioning of wage setting and hiring of skilled timeshare sales personnel, id. at ¶¶ 93, and effectively eliminated competition for timeshare sales services. Id. at ¶ 94. Plaintiffs do not allege that they ever sought or were denied employment with Bluegreen because of the GSA or that Berkley Group and Bluegreen entered into an explicit agreement to suppress wages. Rather, they claim that absent the GSA, Bluegreen could freely solicit Berkley Group's employees, thus driving up the overall compensation and mobility of Berkley Group's employees. Id. at ¶ 66.

Berkley Group argues that plaintiffs' allegations fail to plausibly allege an antitrust claim under federal or state law and that plaintiffs' personal employment interests are not subject to redress under the Virginia Business Conspiracy Act. The court agrees.

5

## II.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Similarly, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

## III.

Section 1 of the Sherman Act states that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To prove a Section 1 violation, a plaintiff must first plead and then prove "(1) a contract, combination, or conspiracy; (2) that

6

imposed an unreasonable restraint of trade."[7] Robertson v. Sea Pines Real Estate Cos., Inc., 679

F.3d 278, 284 (4th Cir. 2012) (quoting Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir.

2002)). Where, as here, the plaintiffs' claims stem from an explicit horizontal agreement,[8] the

question becomes whether the plaintiffs adequately pleaded an unreasonable restraint of trade.

### A.

For this inquiry, "the Supreme Court has authorized three methods of analysis: (1) *per se*

analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some

procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on

competition is particularly difficult to determine." Cont'l Airlines, Inc. v. United Airlines, Inc.,

277 F.3d 499, 508-09 (4th Cir. 2002). "The rule of reason is the accepted standard for testing

whether a practice restrains trade in violation of § 1." Leegin Creative Leather Prods., Inc. v.

PSKS, Inc., 551 U.S. 877, 885 (2007). "Resort to *per se* rules is confined to restraints . . . 'that

would always or almost always tend to restrict competition and decrease output.'" Id. at 888

(quoting Business Electronics Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (2006)).

The *per se* rule applies only in those cases where the business practice in question is one,

which on its face, has "no purpose except stifling of competition." White Motor Co. v. United

States, 372 U.S. 253, 263 (1963); see also Northwest Wholesale Stationers, Inc. v. Pac.

Stationery & Printing Co., 472 U.S. 284, 289-90 (1985) (*per se* rule confined to limited types of

anticompetitive practices); Larry Muko, Inc. v. Sw. Pa. Bldg. & Const. Trades Council, 670 F.2d

421, 429 (3d Cir.) (1982) ("Generally, the application of the *per se* rule has been limited to those

---

[7] The same analysis applies to the plaintiffs' Virginia Antitrust Act claim. Va. Code Ann. § 59.1-9.17; Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 991 n.3 (4th Cir. 1990).

[8] "[A]n agreement among competitors on the way in which they will compete with one another." NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 99 (1984).

7

'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace.").

The Supreme Court has been cautious in extending the *per se* approach to claims that fall outside certain previously enumerated categories of liability. See e.g. NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 100 n.21 (1984) ("[J]udicial inexperience with a particular arrangement counsels against extending the reach of the *per se* rules."); Broad. Music, Inc. v. Columbia Broad. Sys. Inc., 441 U.S. 1, 20 n.33 (1979) ("[T]he *per se* rule is not employed until after considerable experience with the type of challenged restraint."); Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982) ("[E]xperience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it . . . ."). Because of the fact specific inquiry involved in antitrust analysis, the Supreme Court has recognized that claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets.

Plaintiffs argue that the GSA is a naked restraint of trade subject to *per se* analysis because the GSA serves no purpose other than allocating employees between Berkley Group and Bluegreen based on an employee's current or former employer. Am. Compl., Dkt. # 71, at ¶ 76. This argument is undone, however, by the allegations of the Amended Complaint and the terms of the GSA itself. Rather than reflect a naked restraint of trade, Berkley Group entered into the GSA to resolve multiple lawsuits in multiple forums and to avoid future similar litigation. As such, it is an ancillary restraint that must be analyzed under the rule of reason.

Plaintiffs' allegations mirror those in Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136 (D.N.J. 2002). Joseph Weisfeld, an employee of Sun Chemical, alleged that Sun Chemical and

8

certain of its competitors violated Section 1 of the Sherman Act by agreeing to restrain the labor market for technical employees in the printing ink industry. Id. at 142. The agreement arose out of the settlement of a lawsuit challenging the hiring of a Sun employee by Flint, one of its competitors. As part of the settlement agreement, Sun and Flint agreed that for a period of five years neither company would solicit the other's employees and agreed to notify the other if they were planning to hire an unsolicited employee. Weisfeld alleged that over time the scope of the unlawful agreement expanded to encompass an agreement not to hire or consider hiring each other's employees for an indefinite period. As a result, Weisfeld claimed, on behalf of himself and a putative class of similarly situated employees, that the agreement constituted a *per se* violation of Section 1. Id. at 137. Relying on Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001), a case which applied the rule of reason to no hire agreements executed subsequent to the sale of a company, the Weisfeld court concluded that its "case is properly within the rubric of the rule of reason." Id. at 143. Indeed, in Eichorn, the Third Circuit found "no relevant case law" supporting those plaintiffs' allegations that a "no-hire agreement was *per se* illegal because it was a horizontal group boycott and a price fixing conspiracy." Eichorn, 248 F.3d at 143.[9]

In arguing for application of the *per se* rule, plaintiffs principally rely on two cases out of the Northern District of California, In re High-Tech Employee Antitrust Litigation, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), and United States v. eBay, Inc., 968 F. Supp. 2d 1030 (N.D. Cal. 2013), but those cases do not resemble the circumstances presented here.

---

[9] Plaintiffs argue that the no-hire agreement in Eichorn was limited to a period of eight months following the sale of the company, and that the GSA is not so limited. But that argument misses the point of the GSA. To be sure, the GSA itself is not time-limited, but all it does is bind Berkley Group and Bluegreen to honor valid restrictive covenants in each other's employment contracts. The non-competition provision in the Berkley Group employment contracts is limited to one year, and the non-solicitation and confidentiality provisions to two years. In substance, the GSA does little more than bind Berkley Group and Bluegreen not to tortiously interfere with valid employment contracts. Given the context in which the GSA arose, to settle just such lawsuits, the GSA is not properly subject to the *per se* rule.

9

In re High-Tech Employee Antitrust Litigation was a class action suit arising out of an investigation by the Antitrust Division of the Department of Justice into the employment and recruitment practices of several high tech companies, namely Adobe Systems, Inc., Apple Inc., Google Inc., Intel Corp., Intuit Inc., Lucasfilm Ltd. and Pixar. "According to Plaintiffs, the conspiracy consisted of an interconnected web of express bilateral agreements, each with the active involvement and participation of a company under the control of the late Steven P. Jobs . . . and/or a company whose board shared at least one member of Apple's board of directors." 856 F. Supp. 2d at 1110. The plaintiffs claimed the defendants agreed not to recruit employees of each other's companies through cold calling and acted to oversee and enforce their agreements. Defendants moved to dismiss the complaint, arguing that the conspiracy alleged was implausible because the plaintiffs failed to allege a relevant market and that defendants had power within that market. The court disagreed, concluding that the plaintiffs' allegations were sufficient.

> Here, Plaintiffs allege that Defendants are high-tech companies in the market for skilled labor, where cold calling plays an important role in determining salaries and labor mobility. CAC ¶¶ 41-54. Plaintiffs further allege that the labor market for skilled high-tech labor is national. Id. ¶¶ 30, 39. Finally, Plaintiffs allege that "Defendants succeeded in lowering the compensation and mobility of their employees below what would have prevailed in a lawful and properly functioning labor market." Id. ¶ 108. Thus, the Court accepts as true, as the Court must on a motion to dismiss, Plaintiffs' allegation that Defendants succeeded in distorting the market through their agreements. Accordingly, it is reasonable to infer that Defendants had the market power to do so. Cf. Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d 991, 1001 (9th Cir. 2008) ("Evidence of restricted output and supracompetitive prices is direct evidence of market power." (quoting Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997))).

856 F. Supp. 2d at 1122.

Similarly, the court declined to determine whether to apply the *per se* rule, quick look or full blown rule of reason analysis at the motion to dismiss stage in <u>United States v. eBay, Inc.</u>, 968 F. Supp. 2d 1030 (N.D. Cal. 2013). In that case, the government alleged that eBay and Intuit entered into a no-solicitation/no-hire agreement with each other. The alleged agreement arose out of conversations between eBay executives and Scott Cook, founder and chairman of Intuit, who also served on eBay's board. The complaint alleged Cook had stated that "'we don't recruit from board companies, period' and '[w]e're passionate on this.'" <u>Id.</u> at 1033. The court concluded the "allegations concerning the agreement between eBay and Intuit, taken as true, suffice to state a horizontal market allocation agreement." <u>Id.</u> at 1039. The court declined to determine at the pleadings stage whether to apply the *per se* rule, determining that factual development was necessary to resolve the question.

> eBay challenges the United States' assertion that the alleged agreement is a naked one, instead arguing that the agreement is ancillary to a legitimate procompetitive business purpose: Mr. Cook's service on eBay's board. The court agrees with eBay's contention that the fact that the United States labeled the agreement a naked one does not make it so. By the same token, however, the court cannot hold that the agreement is ancillary simply because eBay posits that it is. The court must instead make that determination based on factual evidence relating to the agreement's formation and character.

> \* \* \* \*

> Though the parties supply substantial legal argument to support their respective positions, they do so without the benefit of discovery, and thus without sufficient factual evidence to support their contentions. At this stage in this action, the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply.

<u>Id.</u> at 1039-40.

11

This case presents a far different situation – and far different allegations – than those presented in High-Tech Employees and United States v. eBay. Unlike in either of those two cases, which alleged naked restraints of trade, the amended complaint in this case makes it plain that ¶ 4 of the GSA was not. Rather, the restraint challenged in this lawsuit is one piece of a global settlement agreement between the parties to resolve three suits in two states alleging breach of non-competition agreements, related business torts, trademark infringement and unfair competition. Unlike in High-Tech Employees and United States v. eBay, where the pleadings did not contain any suggestion that the non-solicitation agreement was ancillary to anything, the pleadings in this case clearly establish that the provisions of ¶ 4 at issue in this case were part of a larger agreement to settle multiple lawsuits in multiple forums. It is clear from the terms of the GSA and the context in which it arose that ¶ 4 exists to keep the parties from becoming embroiled in future lawsuits making similar allegations.

In that regard, it is likewise important to focus on what ¶ 4 of the GSA actually provides. Unlike the allegations in High-Tech Employees and United States v. eBay, ¶ 4 of the GSA does not contain a blanket no hire, no cold calling or no solicitation agreement. The GSA is far narrower, reflecting only an agreement "to honor each other's non-competition, non-solicitation and confidentiality agreements of which they have actual knowledge that are contained in written agreements that have not been held unenforceable by a court of competent jurisdiction as to the particular employee." Mem. Supp. Partial Mot. to Dismiss, Ex. A, Dkt. # 14-1. In short, the agreement is little more than a covenant not to violate the law by intentionally interfering with each other's employment contracts. And because the restrictive covenants in the Berkley Group employment contracts are narrowly drawn in terms of substantive scope, time and geography, the alleged restraint posed by the GSA is correspondingly narrow. For example, as the Berkley

12

Group non-competes are limited to 85 miles surrounding the employee's last place of employment with Berkley Group, the agreement to honor each other's non-competes is necessarily limited only to areas where Berkley Group and Bluegreen have timeshare resorts within 85 miles of one another. The parties also agreed not to challenge the validity of confidentiality, non-competition or non-solicitation provisions of each other's employment agreements, to ask job applicants whether they were subject to such agreements, and to terminate a newly-hired employee subject to such an agreement upon receiving notice from the other party. Id. Having been subject to multiple lawsuits in multiple forums, the agreement crafted by the parties in ¶ 4 of the GSA is plainly designed to forestall future litigation. Consistent with the analysis employed by the court in Weisfeld, ¶ 4 of the GSA cannot be divorced from the context in which it arose and its express terms reflecting that it was part of a broader settlement agreement. See Weisfeld, 210 F.R.D. at 138, 142. As such, ¶ 4 of the GSA cannot be considered to be a naked restraint of trade with obvious anticompetitive effects subject to the *per se* rule. [10] Rather, the validity of such an agreement must be assessed under the rule of reason.[11]

---

[10] Nor does the "quick look" method of analysis apply here. "'Quick look' is essentially an abbreviated form of rule of reason analysis, to be used in cases in which the likelihood of anticompetitive effects is so obvious that 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" Madison Square Garden, L.P. v. Nat'l Hockey League, 270 F. App'x 56, 58 (2d Cir. 2008) (quoting Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999)).

[11] Defendants filed a partial motion to dismiss the original complaint, asking the court to find that plaintiffs' claim that the *per se* rule or quick look approach did not apply to this case. After briefing on argument, the court did just that, stating as follows:

> [T]his is not a naked, horizontal restraint of trade. This is not horizontal market allocation. This is not bid-rigging. This is not price fixing. This is not an agreement to exchange customers. This is an ancillary restraint of trade, if you call it that, that is resulting from the settlement of a lawsuit over non-competes. And it seems to me that all this thing does is – the agreement says we're not going to violate the law. We won't break the law by stealing your customers if you agree not to break the law by stealing my customers.

Trans. of April 3, 2014 Hearing, Dkt. No. 60, at 3. At that juncture, defendants did not challenge the legal sufficiency of the complaint under the rule of reason. Following the filing of the amended complaint, defendants did so, which the court addresses herein.

13

**B.**

While § 1 of the Sherman Act is framed in broad terms, the courts have long limited its application to concerted activity that unreasonably restrains trade. "Not every instance of cooperation between two people is a potential 'contract, combination . . . or conspiracy, in restraint of trade.'" Loren Data Corp. v. GXS, Inc., 501 Fed. Appx. 275, 280 (4th Cir. 2012) (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 189-90 (2010). Indeed, "Section 1 applies only to concerted action that restrains trade." Am. Needle, 560 U.S. at 190. Thus, to establish a claim under § 1 of the Sherman Act, a plaintiff must establish that the conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets. See, e.g., Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984) (Analysis under the rule of reason requires "an inquiry into market power and market structure designed to assess the combination's actual effect.") "In the rule of reason analysis, 'the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." Dickson v. Microsoft Corp., 309 F. 3d 193, 206 (4th Cir. 2002) (quoting Oksanen v. Page Mem. Hosp., 945 F. 2d 696, 708 (4th Cir. 1991)). As the Fourth Circuit noted in Dickson v. Microsoft Corp.:

> This evaluation requires a showing of "anticompetitive effect" resulting from the agreement in restraint of trade. To have an "anticompetitive effect," conduct "must harm the competitive *process* and thereby harm consumers." United States v. Microsoft, 253 F.3d 34, 58 (D.C. Cir. 2001). "[H]arm to one or many competitors will not suffice." *Id.* "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id.* (internal quotation marks omitted). Thus, an inquiry into the lawfulness of the restraint begins "by identifying the ways in which a challenged restraint might possibly impair competition." 7 [Phillip E.] Areeda & [Herbert] Hovenkamp [Antitrust Law] ¶ 1503a, at 372 (1995). After identifying the type of possible harm to competition alleged, we must proceed "to determine whether

14

that harm is not only possible but likely and significant," which requires "examination of market circumstances," including market power and share. 7 *id*. ¶¶ 1503a 1503b, at 374-77.

309 F. 3d at 206.

Berkley Group argues that the amended complaint does not plausibly allege an unreasonable restraint of trade, the existence of market power or relevant product and geographic markets. Plaintiffs respond that the amended complaint sufficiently alleges a conspiracy between Berkley Group and Bluegreen to restrain trade in the purchase of timeshare sales services and posits two relevant geographic markets consisting of the areas around the Great Eastern timeshare resorts at Massanutten and in Williamsburg, Virginia. "'Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely,' or much less is 'substantial in magnitude.'" Dickson v. Microsoft Corp., 309 F. 3d at 207 (quoting 7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1503a, at 373 (1995)). The court must examine whether plaintiffs have "alleged the likelihood of a substantial anti-competitive harm caused by [the GSA], an inquiry that requires [plaintiffs] to allege facts demonstrating 'that defendants played a significant role in the relevant market.'" Id. (quoting Oksanen, 945 F.2d at 709).

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market." Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001). Such hesitancy is unwarranted in this case, however, due to the innate implausibility of plaintiff's allegations.

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be

15

plausible." Todd, 275 F.3d at 200 (internal citation and quotation marks omitted). "The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market." Brown Shoe Co. v. United States, 370 U.S. 294, 336 (1962). The geographic market must "both correspond to the commercial realities of the industry and be economically significant." Id. at 336–37 (internal quotations removed).

In product market terms, plaintiffs allege a buyer-side conspiracy affecting the market in which employers compete to purchase the services of timeshare salespersons. Am. Compl., Dkt.# 71, at ¶ 47. While such a broad allegation sounds nefarious, the actual restraint found in the GSA is far less so.

First, the restraint only involves two timeshare owners, Berkley Group and Bluegreen. A relevant product market of purchasers of timeshare salesperson services cannot plausibly be limited to these two entities. While plaintiffs concede in the amended complaint that "[c]ompanies in the same or similar industries often compete to hire and retain talented employees," Am. Compl., Dkt. # 71, at ¶ 47, they make no effort to identify such companies or industries, or even assign market shares to Berkley Group and Bluegreen in their artificially and arbitrarily drawn market. At most, the amended complaint alleges that Bluegreen and Berkley Group are in the timeshare resort business and compete as buyers of timeshare salespersons' services. But the Amended Complaint is devoid of any factual allegation that these two entities have market power, enjoy any measure of market share, are so unique as to constitute the entire product market, or that timeshare sales personnel could not look elsewhere for employment.

In short, plaintiffs seek to define an unreasonably narrow and implausible product market limited to just two timeshare sales companies. In Eichorn, the plaintiffs made similar allegations, seeking to define the market as:

> potential employers within a 35 mile radius of Holmdel/Middletown with the capacity and capability of employing or utilizing large numbers of persons with specialized experience in high speed data communications equipment of the sort Paradyne develops and makes . . . who can provide continuity of the pension benefits which have accrued to [plaintiffs] under the AT & T and/or Lucent pension plans.

248 F.3d at 147 (citation omitted). This definition had the effect of including only the defendants in the relevant market. Id. The Eichorn court held that the proper market definition "includes all those technology companies and network services providers who actively compete for employees with the skills and training possessed by plaintiffs." Id. at 147-48. The same is true here. Not only do plaintiffs' allegations fail to consider competition posed by other timeshare resorts, they wholly fail to account for competition posed by purchasers of salespersons' services generally. Even if industry specific knowledge will not directly benefit a prospective employer, sales experience is highly sought after in numerous industries, which the plaintiffs have failed to even attempt to identify. Plaintiffs make no effort to consider, as they must, the reasonable interchangeability and cross-elasticity of demand for their services. Absent some allegation suggesting that Bluegreen and the Berkley Group are the only purchasers of timeshares salespersons' services, there is no plausible basis to suggest, much less allege, that the Bluegreen and Berkley Group constitute the entirety of the relevant market. Plaintiffs cannot, and do not, allege that Bluegreen and Berkley Group are the only buyers of such services to whom persons seeking timeshare sales jobs could turn or have market power in an appropriately defined market. Thus, it is implausible to suggest that the relevant product market be confined just to them.

Even more implausible is the relevant geographic market proposed by plaintiffs. The plaintiffs focus on the two areas of Virginia, Massanutten and Williamsburg, where Berkley Group and Bluegreen have timeshare resorts within eighty-five (85) miles of each other. Am.

17

Compl., Dkt. # 71, at ¶ 88.  It is utterly unrealistic to suggest that the relevant geographic market be confined to two enclaves in non-contiguous regions of Virginia.  The plaintiffs do not and cannot even allege that these are the only two areas in Virginia having timeshare resorts.  In short, it simply makes "no economic sense," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), for plaintiffs to gerrymand a relevant geographic market exclusively limited to an eighty-five (85) mile area surrounding the Berkley Group timeshare resorts in Massanutten and Williamsburg and ignore, for example, competition posed by timeshare resorts in other parts of Virginia and surrounding areas.  For example, while Virginia Beach and the Outer Banks of North Carolina are in close proximity to Williamsburg, plaintiffs arbitrarily exclude timeshare resorts located there from the relevant market. The reason, of course, that plaintiffs must strain to confine the relevant geographic market to these localities is because the GSA itself has only an isolated territorial impact.  In the GSA, Bluegreen agrees to honor noncompetition agreements involving Berkley Group employees.  These noncompetition provisions are limited to a radius of eighty-five (85) miles surrounding the timeshare resort where the employee worked for defendants.  Thus, the GSA only applies to areas where Bluegreen has a timeshare resort within eighty-five (85) miles of a resort operated by Berkley Group.  Such a geographic market is entirely artificial and bears no relation to the economic realities of the market.  It is utterly implausible.  Plaintiffs' failure to properly allege relevant product and geographic markets, and, thus, to plausibly allege Berkley Group and Bluegreen's market share, or the exercise of market power, therein, is fatal to their claims.  Absent such plausible allegations, plaintiffs cannot establish that the GSA is "capable of causing any substantial harm to competition." Dickson, 309 F.3d at 208.

18

Because the plaintiffs have failed to plausibly allege an unreasonable restraint of trade and have not put forth a plausible product market or geographic market, they cannot state a claim under either Section 1 of the Sherman Act or the corresponding Virginia Antitrust Act.

## IV.

Plaintiffs also fail to state a claim under the Virginia Business Conspiracy Act, Va. Code § 18.2-499. "[I]t is well-settled that [§ 18.2-499] applies only to injuries 'to business and property interests, not to personal or employment interests.'" Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 321 (4th Cir. 2012) (quoting Andrews v. Ring, 266 Va. 311, 585 S.E.2d 780, 784 (2003)). The harm alleged throughout the amended complaint concerns the employment interests of timeshare salespersons. For example, ¶ 67 alleges that "[t]he agreement harmed and continues to harm employees by reducing the pay, benefits, and employment opportunities they might otherwise have earned if competition had not been eliminated." Am. Compl., Dkt. # 71, at ¶ 67. Likewise, in ¶ 90, the amended complaint alleges "[t]he agreement between Berkley and Bluegreen was an ideal tool to suppress employee compensation." Id. at ¶ 90. Paragraph 131 claims that "this agreement suppressed competition between Berkley and Bluegreen for skilled workers, with the natural and intended effect of reducing their compensation, and limiting affected employees' ability to secure better compensation, benefits and working conditions." Id. at ¶ 131. Despite these allegations, plaintiffs seek on brief to skirt this well recognized limitation on the Virginia Business Conspiracy Act by characterizing the injury as suppressed price. But even this argument is unavailing as the price they claim has been suppressed is their compensation. A claim of reduced compensation is simply not actionable under the Virginia Business Conspiracy Act.

19

In <u>Shirvinski</u>, the plaintiff was a private consultant working at a United States Coast Guard facility. After workplace tensions flared out of hand, the plaintiff was terminated by the subcontractor who employed him. The plaintiff alleged a conspiracy under Va. Code § 18.2-499, but the Fourth Circuit Court of Appeals concluded that the plaintiff's claim failed because he could not "demonstrate an injury to a business interest." 675 F.3d at 321. Because the plaintiff "neither owned a company, did business as a separate organization, nor had a separate tax identification number for his contractor status[ ] . . . [he] suffered damage only to his personal employment prospects." <u>Id.</u> Here, plaintiffs' injury is only to their employment interests. Plaintiffs are not private contractors or individual companies, nor do they allege they conduct their timeshare sales as a separate organization or under separate tax identification numbers. The only alleged injury is to their employment interests in their personal wages.

The cases cited by plaintiffs are distinguishable from this case. In <u>Wuchenich v. Shenandoah Memorial Hospital</u>, 215 F.3d 1324, 2000 WL 665633 (4th Cir. 2000) (unpublished table decision), Dr. Wuchenich provided anesthesiology services to the hospital's patients under a written twelve-month Physician Guarantee Agreement with mutual covenants and agreements. 2000 WL 665633 at *1. In order to begin working at the hospital, Dr. Wuchenich closed his well established private practice in California and opened a new private practice in Woodstock, Virginia. Unlike the plaintiffs, Dr. Wuchenich maintained his own business, a private practice, through which he associated with and provided services to the hospital and its patients under a contract. Similarly, in <u>Luckett v. Jennings</u>, 246 Va. 303, 435 S.E.2d 400 (1993), Luckett alleged harm to his separate "business of real estate development." 246 Va. at 305, 435 S.E.2d at 400. Luckett "describe[d] the nature of [his] business as a real estate developer, including the specific types of activities he undert[ook] in the conduct of his business." <u>Id.</u> at 307-08, 435 S.E.2d at

20

402. In contrast, plaintiffs' claims are solely rooted in their employment relationships with Berkley Group and do not constitute injury to a business or property interest. As such, plaintiffs' employment interests are not subject to redress under the Virginia Business Conspiracy Act.

**V.**

In sum, plaintiffs fail to plausibly allege an unreasonable restraint of trade in a properly defined relevant product or geographic market. Further, they seek redress for merely employment interests, not business or property interests. As a result, plaintiffs have failed to allege a plausible claim under Section 1 of the Sherman Act, 15 U.S.C. § 1; the Virginia Antitrust Act, Va. Code § 59.1-9.5; or the Virginia Business Conspiracy Act, Va. Code § 18.2-499, and the defendant's motion to dismiss must be **GRANTED**. Plaintiffs have already had an opportunity to amend their complaint, and the court believes that further amendment would be futile. Accordingly, plaintiffs' claim will be dismissed with prejudice.

An appropriate Order will be entered.

Entered: 05-28-15

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

21
